## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE CHRISTIAN | ) | |
| 109 Signal Hill Road, | ) | |
| Holland, Pennsylvania 18966, | ) | |
| | ) | Civil Action No. 2:24-cv-01319-MRP |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| OMNIS GLOBAL TECHNOLOGIES, LLC | ) | |
| 3710 Collins Ferry Road, | ) | |
| Morgantown, WV 26505 | ) | |
| and | ) | |
| OMNIS BUILDING TECHNOLOGIES, LLC | ) | |
| 3710 Collins Ferry Road, | ) | |
| Morgantown, WV 26505 | ) | |
| and | ) | |
| OBT BLUEFIELD, LLC | ) | |
| 3710 Collins Ferry Road, | ) | |
| Morgantown, WV 26505 | ) | |
| and | ) | |
| OMNIS FUEL TECHNOLOGIES LLC | ) | |
| d/b/a OMNIGEN | ) | |
| 3710 Collins Ferry Road, | ) | |
| Morgantown, WV 26505 | ) | |
| and | ) | |
| OMNIS SUBLIMATION RECOVERY | ) | |
| TECHNOLOGIES, LLC | ) | |
| 3710 Collins Ferry Road, | ) | |
| Morgantown, WV 26505 | ) | |
| and | ) | |
| SIMON HODSON | ) | |
| 3710 Collins Ferry Road | ) | |
| Morgantown, WV 26505 | ) | |
| | ) | |
| Defendants. | ) | |

## <u>FIRST AMENDED CIVIL ACTION COMPLAINT</u>

Plaintiff, Michelle Christian, by and through her undersigned counsel, brings this action

against the above-named Defendants, and avers as follows:

## I.     INTRODUCTON

1.     Plaintiff has initiated this action to redress violations against her former employers under Title VII, 42 U.S.C. §2000e, *et seq*, the Pennsylvania Human Relations Act ("PHRA"), the False Claims Act, 31 U.S.C. § 3730(h)(1), unjust enrichment, breach of contract, the Pennsylvania Wage Payment and Collection Law ("WPCL") 43 Pa. Stat. Ann. § 260.9, and for promissory estoppel.  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth *herein*.

## II.     JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.     This Court may properly maintain personal jurisdiction over Defendants because the contacts with this state and this judicial district is sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) because Plaintiff worked for Defendants in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

5.     On or about November 26, 2023, Plaintiff filed a timely charge alleging discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"),

docketed at Charge No. 530-2024-01093. This charge was simultaneously filed with the Pennsylvania Human Relations Commission.

6.     The EEOC issued a Notice of Right to Sue on January 7, 2024.

7.     This Complaint is filed within 90 days of receipt by the Plaintiff of the Notice of Right to sue.

### III.     PARTIES

8.     Plaintiff is an adult individual with an address as set forth in the caption.

9.     Defendants are all Delaware companies with shared primary business operations located at 3710 Collins Ferry Road, Morgantown, West Virginia 26505.

10.     Defendant Simon Hodson is founder and chairman of the Omnis enterprises.

11.     As discussed *infra,* though various of the Defendant entities utilize a "P.O. Box" out in California for business  purposes, there are no actual business operations existent in California and all of these different entities operate through the same owners and executive management toward a singular purpose: specializing, developing, licensing and commercializing innovative technologies to aid in the areas of clean and sustainable energy, affordable housing, organic farming, and biodegradable plastics.

12.     Plaintiff performed work for and on behalf of all Omnis Defendants.

13.     At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

### IV.     FACTUAL ALLEGATIONS

14.     Plaintiff began working for Defendant Omnis Global Technologies LLC on November 16, 2020 as its "Vice President of Government Relations."[1]

15.     Plaintiff's job duties included connecting all Defendant Omnis companies with private and public contacts to develop all Defendant Omnis' businesses.

16.     Though Defendant Omnis Global Technologies LLC is based out of Santa Barbara California, Plaintiff was hired to work from her home in Bucks, County PA (and asked to travel where and when needed).

17.     Moreover, Defendants' Santa Barbara location ceased operations during Plaintiff's period of employment[2], and Defendants' primary lab and offices were all out of the West Virginia location as set forth in the caption.

18.     Plaintiff was hired by Defendants' owner: Simon K. Hodson (*hereinafter* "Hodson"), and Plaintiff's offer letter indicated she would report directly to Hodson.

19.     Upon information and belief, Hodson owns and operates nearly 50 different companies; however, Hodson specifically brought Plaintiff on to focus her efforts on the Defendant Omnis entities.

20.     Hodson sought to monopolize Plaintiff's then existing federal government contacts and her existing contacts with elected state officials (as Hodson was attempting to secure funding and garner support for his ongoing and expanding business projects).

21.     At all relevant times, Hodson's son, Jonathan Hodson, held himself out as a "President" of Defendant Omnis Building Technologies.

---

[1] Defendants do not make any efforts to recognize corporate formalities, and comingle assets between Defendant entities, entangle leadership, and overall business operations.  To wit, Plaintiff was initially paid through Defendant Omnis Global Technologies LLC, but as time went on, Defendants started paying Plaintiff through Defendant OBT Bluefield LLC and the other named Defendants; importantly, Plaintiff reported to individuals within each of these entities and was held out to the public (including government entities) as working for each of the named Defendants.

[2] The only "business operations" currently existent in California is a P.O. Box.

22.     At all relevant times, Hodson's other son, Michael Hodson, assisted with operations aspects of Defendant entities in various capacities.

23.     Hodson and his two (2) sons are members of the Latter-Day Saints Church ("LDS").

24.     Defendants' Vice President of Human Resources, Mathew Hart, is also a member of the LDS (while Hart holds himself out publicly as VP HR for Defendant "Omnis Building Technologies," he performs Human Resources functions for each of the Defendant entities).

25.     Defendants' General Counsel, Blake Stephens, is also a member of the LDS (while Stephens holds himself out publicly as GC for "Omnis Building Technologies," he performs GC functions for each of the Defendant entities).

26.     Defendants' CFO, Randall Smith, is Hodson's brother-in-law, is also a member of the LDS (while Smith holds himself out publicly as CFO for "Omnis Fuel Technologies LLC," he performs CFO functions for each of the Defendant entities).

27.     Defendants have consistently hired Hodson's relatives for high-level positions within their companies, as well as any direct support staff working intimately with Defendants' management.

28.     Most of Defendants' high-level managers and inner support staff are affiliated with the Latter-Day Saints Church.

29.     Plaintiff is not a member of the LDS; therefore, Hodson sought to "convert" Plaintiff to his religion and press his religious views on her throughout her entire period of employment with Defendants (and aggressively so).

30.     Many work conversations within Defendants' management brought about a discussion on religion (including facilitating LDS prayers at business meals) or included talking about events the LDS was hosting (simply by way of examples).

31.     Hodson was quite vocal with Plaintiff about his intentions to "bring her over," (meaning have her join the LDS) and Plaintiff often uncomfortably and politely declined.

32.     Plaintiff was vocal to both Hodson himself, and Jonathan Hodson about her protestations of Hodson's behavior about religion and her preference not to discuss religion at work.

33.     Defendants did not maintain any type of employee handbook during Plaintiff's tenure and had no real avenue for redress of internal complaints (and Hart: VP of Human Resources -- openly condoned some of Defendants' obvious discriminatory behaviors).

34.     Simply by way of example, at a company meeting, Stephens was speaking of his young child, and Hodson made a negative remark **about women being better suited for staying at home**.  Thereafter, Hodson directed Stephens to share an LDS prayer with Plaintiff and actually directed him to print it out.

35.     LDS teachings proscribe "responsibilities and blessings" of an LDS wife, and emphasize a woman's support of a male as the "patriarch of the home."

36.     Plaintiff reported to Hart that she opposed Simon's derogatory comment  about women being at home, and Stephens providing her with a written copy of an LDS prayer; shockingly, Hart said *he found nothing wrong with it and believed in those teachings himself*.

37.     Plaintiff was one of the few, if not only, females in an executive position with Defendant entities.

38.     During Plaintiff's time working for Defendants, she felt intentionally isolated and marginalized as both a female employe, and an employee who refused to commit to Defendants' LDS church.

39.     Defendants' management made numerous denigrating comments to Plaintiff, making generalized negative statements about her capabilities, or talking down to Plaintiff as if she was not a contributing member to meetings or the team, or as if her opinion was not nearly as important as that of her male LDS peers.

40.     Plaintiff did not witness Defendants' management make any similar comments or exhibit similar behaviors to any male employees, or any employees who were also members of the LDS Church.

41.     Throughout her employment, Plaintiff weas also subjected to constant inappropriate comments about her physical appearance.

42.     Other activities took place that demonstrated Hodson did not value women as equal contributors and clearly saw young impressionable women as merely potential new members of his faith (to be married off to LDS members).

43.     Between in or about September of 2020 and through 2022, Hodson met two (2) girls, ages 16 and 17, in Johnstown, Pennsylvania.

44.     These two (2) girls began traveling with Hodson and the company throughout Pennsylvania, West Virgina, and California.

45.     Hodson gave the impression he was going to have the girls work for Defendants (even creating a company email address for one of them), but Plaintiff never actually saw these girls perform any job duties for Defendants.

46.     Plaintiff adamantly expressed her discomfort in having girls who were in high school and under 18 years of age stay in hotels with Defendants' management (and frankly as a concept in general).

47.     Hodson provided monetary consideration to these girls to entice them continue on with Defendants entities travel affairs (including for example, paying cash for their own medical treatment).

48.     Although it was clearly not part of her job responsibilities (but since Plaintiff was one of the few, if not the only, female executive within Defendant entities), Hodson asked Plaintiff to watch over the girls and take care of them.

49.     No other male employees were asked to watch over and take care of these girls.

50.     Plaintiff then asked not to be involved with these young girls or the situation anymore.

51.     Plaintiff later discovered that Hodson and other Omnis LDS employees were taking these young girls to his Latter-Day Saints Church and other LDS events.

52.     Hodson later asked Plaintiff to help the girls with getting into college; Hodson's ongoing efforts to convert these women to his Church was interfering with Plaintiff's ability to do her job and she was vocal about her disinterest in being involved.

53.     Hodson wanted one of them to attend West Virginia University since his son, Jonathan Hodson, and his lab and offices would be in Morgantown, WV near that school.

54.     As Plaintiff was objectively being treated like Hodson's personal assistant or a female caretaker (and she felt obligated to do it because Hodson directed it), Plaintiff became briefly involved with these girls again when they first enrolled at WVU but had no further

contact with the girls until Hodson asked her to help them get a "waiver" to live off campus so Hodson could obtain and pay for these girls' apartment off campus.

55.     Upon information and belief, one of these young women is now married to a member of the LDS Church, and the other young woman is attending Brigham Young University, an institution holding itself out to the public as "founded, supported and guided by The Church of Jesus Christ of Latter-Day Saints."

56.     In short, Defendants repeatedly tried to convert Plaintiff to their religion, and entangled her in their efforts to do so with other females, often pressuring her to assist in their efforts as if it was part of her job duties.

57.     Plaintiff experienced antagonism by Hodson any time she expressed resistance in his or the company's effort to focus on religion or opposed converting persons to their religion.

58.     Plaintiff was specifically told Hodson did not believe women should be in the workplace and their role was in the home; in line with those beliefs, Hodson often singled Plaintiff out and mistreated her due to her status as a female.

      **i.)**    **Plaintiff's Complaints to Hodson in August and September of 2023 regarding Fraud on the Government and Sex Based Harassment.**

59.     Between June through August 2023, Plaintiff began asking Hodson questions about his various companies and how certain things did not make sense financially.

60.     Plaintiff was concerned about Hodson and the Defendant Omnis companies making false representations to state and federal officials in order to receive funds and assistance in the form of government loans and grants.

61.     Plaintiff's concerns peaked when she realized that Hodson and the Omnis companies had made so many misrepresentations to government officials that it would be

extremely difficult for Plaintiff to support the claims without further understanding so she continued to ask Hodson questions.

62.     Hodson curtly responded by telling Plaintiff that she is "always whining" and that she "whines a lot."

63.     On or about June 28, 2023, Plaintiff contacted Charles Gassenheimer, an employee of Omnis Bailey, LLC and Omnis Regenerative, LLC, regarding her concerns about the financing and validity of statements Hodson was making to state and federal government officials.

64.     Charles Gassenheimer informed Plaintiff that since she was "not one of them," referring to being a member of the Latter-Day Saints Church, that she will get nowhere, no one will listen to her, and no one will take her concerns seriously.

65.     On August 30, 2023, Plaintiff finally confronted Hodson about the truthfulness of statements he was making to state and federal government officials, openly objecting to his ongoing efforts to defraud government officials for investment funds.

66.     This was not an off handed conversation, but lasted several hours; Plaintiff accused Hodson of lying to the Federal Department of Energy and the West Virginia Government, and insisted she would not lie on his behalf.

67.     Hodson knew Plaintiff had active meetings occurring and planned with government officials in the coming weeks regarding his efforts to secure a nearly $50 million-dollar forgivable loan (i.e. that her intent to report him to the Government was imminent).

68.     Hodson overtly tried to minimize Plaintiff's complaints by trying to appeal to Plaintiff as a female, and making an actual advance toward her saying: "hold my hands and look into my eyes and tell me you believe me."

69.     Plaintiff immediately responded: "**<u>don't touch me</u>**," and Hodson said: "Then you should go."

70.     Plaintiff walked away from the incident clearly distraught and on the verge of tears, but she was fearful of showing her emotions to Hodson, given some of the stereotypes he had already voiced about women being in the workplace.

71.     On or about September 5, 2023, Hodson sent Plaintiff a text message which stated in part:

> "Hi Michelle, I hope you had a good weekend. There was a lot accomplished last week. Thank you for your significant support and impact. However, as we discussed, there is an urgent need to clarify roles and responsibilities as we grow and develop the several OGT companies. Going forward, we believe that your most critical role is to work directly for OBT Bluefield at a monthly gross compensation of $20,000. You will work with and report directly to Jonathon Hodson. Your primary duties will be to coordinate all the WV State contacts and activities to ensure the best completion and start-up of the first manufacturing plant in Bluefield. This will include coordination of support and opportunities with Federal Agencies, State Agencies and strategic customers. Subsequently, we would ask you to leverage the first plant's success to other sites in WV and surrounding States. This is a national company with huge market opportunity. Thank you for your great support to make this a success."

72.     The text message continues in great detail requesting Plaintiff help the Omnis entities in other areas, and stating, "You have helped tremendously."

73.     The text message ended by Hodson stating:

> "We are always open to discussing with you other changes that would best enable you to be most effective in your employment with the Omnis companies. Please give me your feedback on the above structure asap so that we can memorialize all this in an employment letter. I am also reviewing with our accounting team the resolution of your payroll to make sure that you received all the payments, including any bonuses, that were promised. I will complete this by Wednesday. Sincerely, Simon K. Hodson."

74.     On September 6, 2023, at 9:44 a.m., Plaintiff sent Simon Hodson an email stating in part:

> "Simon, it is important for you to understand how important the communities in West Virginia are to me.  **The treatment I have endured by you and others who work with you has been unbearable. . . My proposal also ensures that the incident that took place at the Greenbrier Resort on Wednesday, August 30, will never happen again, since I will be a Contractor and not an Employee.  I assume that you would never ask a male employee to hold your hand and look into your eyes to know the truth.  It is troubling that when I refused to hold your hand and look into your eyes, you state that you would let me go.**"

75.     On September 9, 2023— days after Plaintiff had expressly raised concerns about the misrepresentations Hodson was making to government officials, and almost immediately after she complained to Hodson about overt sex based harassment — Stephens (General Counsel) instructed her to "immediately cease and desist all work for any of the Omnis companies."

76.     On September 10, 2023, Stephens threatened Plaintiff by stating, "Please be very careful about how you move forward here Michelle."

77.     Plaintiff was offered no explanation for her termination – and in fact, to date, Defendants have falsely represented that Plaintiff **voluntarily resigned from her employment**.

78.     Defendants were so concerned about Plaintiff's intended whistle blowing activities, Defendants then filed a separate civil action against Plaintiff in Bucks County Court of Common Pleas, making claims of conversion so they could obtain her computer (a personal computer which was not even Defendants'  property) and then making threats of *anticipated* claims for violation of trade secret laws, of which they have no proof.

## COUNT I
## SEX DISCRIMINATION, RETALIATION, AND HARASSMENT
## IN VIOLATION OF TITLE VII,

*42 U.S.C. §2000e, et. seq*

79.     Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

80.     Defendants took an adverse employment action against Plaintiff based on her sex by, among the other conduct alleged herein, constantly (1) making comments about her physical appearance; (2) making demeaning comments to Plaintiff solely because she was a woman; and (3) making her perform tasks that were not in her job description solely because she was a woman.

81.     Plaintiff expressly opposed Hodson's mistreatment toward her due to her sex in extremely close proximity to her abrupt separation.

82.     The sex-based discrimination Plaintiff experienced was both severe and pervasive, as Plaintiff was subjected to it on multiple occasions throughout her employment and leading to her ultimate separation.

## COUNT II
## RELIGIOUS DISCRIMINATION, RETALIATION, AND HARASSMENT
## IN VIOLATION OF TITLE VII
### *42 U.S.C. § 2000e*

83.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

84.     Hodson and many other Omnis executives were part of the LDS Church.

85.     Hodson and other high-level managers within Defendants constantly spoke of their religion and encouraged Plaintiff to engage in discussions about the LDS Church and to become a member.

86.     Hodson often mistreated Plaintiff because her religious beliefs did not align with his and other Omnis employee's religious beliefs.

87.     Plaintiff repeatedly engaged in protected activity by protesting Hodson's efforts to force his religious views upon her, complaints she also shared with other high-level executives within Defendants.

88.     Plaintiff therefore avers she was subject to religious discrimination, subject to a hostile work environment on account of her religious views and terminated for engaging in protected conduct under Title VII by opposing religious discriminatory practices in the workplace.

## COUNT III
## RETALATION IN VIOLATION OF THE FALSE CLAIMS ACT
### *31 U.S.C. § 3730(h)(1)*

89.     Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

90.     During her employment, Plaintiff became concerned about Hodson and the Omnis companies making false representations to state and federal officials in order to receive funds and assistance in the form of government loans and grants.

91.     Plaintiff reasonably believed Defendants were altering their books to make it appear as if Defendants were in a better financial position than they actually were, and that Hodson was presenting these altered financial statements to state and federal officials to secure government funds.

92.     To investigate these concerns, Plaintiff contacted Charles Gassenheimer, an employee of Omnis Bailey, LLC and Omnis Regenerative, LLC, on or about June 28, 2023.

93.     Charles Gassenheimer informed Plaintiff that since she was "not one of them," that she will get nowhere, no one will listen to her, and no one will take her concerns seriously.

94.     On or about August 30, 2023, Plaintiff confronted Simon Hodson about the false statements that he was making to state and federal government officials to receive funding government funding and made known her intentions to report his false claims to government officials.

95.     Four days later, Simon Hodson sent Plaintiff an email informing her that her role at the company was changing, that she was only going to work for OBT Bluefield, and that she would report directly to his son, Jonathan Hodson.

96.     Plaintiff responded to this email, reiterating the concerns she raised to him on August 30, 2023.

97.     A few days later, Defendants' General Counsel, without explanation, instructed Plaintiff to "immediately cease and desist all work for any of the Omnis companies."

98.     Defendants then abruptly terminated Plaintiff's employment.

99.     This retaliatory termination was motivated by Plaintiff raising the aforementioned concerns to Hodson.

100.    Based on information and belief, Hodson feared that Plaintiff would report Defendants' fraudulently misrepresentations to the state and federal government, so he moved to terminate her employment.

**COUNT IV**
**UNJUST ENRICHMENT**

101.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

102.    Plaintiff was hired by Defendants in November 2020 at an annual salary of $250,000.00.

103.    Due to Defendants' financial condition in July 2021, Plaintiff was furloughed.

104.    In an effort to retain several employees, Defendants began offering incentive bonuses.

105.    On July 22, 2021, Defendants sent Plaintiff an offer letter to return to her position.

106.    That written offer stated, among other things, that: 1) Plaintiff would be compensated at an annual salary of $54,080.00; and 2) Defendants would pay Plaintiff a bonus following its receipt of $10 million or more in outside funding.

107.    Defendants, both in writing and orally, represented that bonus would be 110% of the difference between the compensation Plaintiff would have received under her terms of employment prior to this furlough ($250,000.00) and the compensation she received following her return to employment ($54,080.00).

108.    This non-discretionary bonus of $215,512.00 induced Plaintiff's return to Defendants, and in fact, Plaintiff accepted this offer and began working for Defendants.

109.    Thereafter, upon information and belief, Defendants did obtain in excess of $10 million in outside funding.

110.    Despite this, Plaintiff never received any of the $215,512.00 promised to her by Defendants.


**COUNT V**
**BREACH OF CONTRACT**

111.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

112.    The assertions set forth in Count III also establish a claim for breach of contract, as the Parties entered into an express written contract for a specific bonus amount.

113.    Those conditions were satisfied and Defendants materially breached the terms of the Parties' agreement.

<u>**COUNT VI**</u>
**UNPAID WAGES IN VIOLATION OF PENNSYLVANIA'S WAGE PAYMENT
AND COLLECTION LAW**
*43 Pa. Stat. Ann. § 260.9a*

114.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

115.    Plaintiff was employed by Defendants.

116.    As part of her terms of her compensation, Defendants contractually agreed to pay Plaintiff a non-discretionary bonus in the amount of $215,512.00 upon receipt of $10 million or more in outside funding.

117.    Thereafter, Defendants obtained in excess of $10 million or more in outside funding.

118.    Despite numerous promises to do so, Defendants never paid Plaintiff her non-discretionary bonus of $215,512.00.

119.    Defendants then terminated Plaintiff's employment without paying her the bonus.

120.    Plaintiff's unpaid bonus is a "wage" under the Pennsylvania Wage Payment and Collection Law. 43. P.S. § 260.2a.

121.    Plaintiff's unpaid bonus is also a "fringe benefit and wage supplement" under the Pennsylvania Wage Payment and Collection Law, which must be paid "within 10 days after such payments are required to be made directly to the employee, or within 60 days of the date when proper claim was filed by the employee in situations where no required time for payment is specified." 43 P.S. § 260.3(b).

122.    Defendants' failure to pay Plaintiff's non-discretionary bonus of $215,512.00 is a violation of the WPCL.

123.    The $215,512.00 has remained unpaid more than sixty days after payment became due.

124.    Plaintiff is entitled to liquidated damages in an amount equal to twenty five percent of the unpaid wages. 43 P.S. § 260.10.

## COUNT VII
## PROMISSORY ESTOPPEL

125.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

126.    Defendants should have reasonably expected that its promise to pay Plaintiff $215,512.00 would induce Plaintiff to return to her position following a furlough.

127.    Plaintiff detrimentally relied on this promise, as she would not have returned to Defendants at a salary that was almost four times less than what she was previously making without it.

128.    Defendants not only agreed in writing to pay Plaintiff this bonus but also reaffirmed this promise several times throughout Plaintiff's employment.

129.    Defendants should have reasonably expected that repeatedly assuring Plaintiff that it would pay her the bonus would induce Plaintiff to continue working for Defendants.

130.     Plaintiff detrimentally relied on Defendants' repeated assurances, as she would not have continued to work for Defendants if she knew that they would never pay her the promised bonus.

### COUNT VIII
### SEX DISCRIMINATION, RELIGIOUS DISCRIMINATION, RETALIATION, AND HARASSMENT
### IN VIOLATION OF THE PHRA
### Title 43 P.S. §§ 951-963
### Against All named Defendant Entities and Defendant Simon Hodson

131.     Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

132.     Plaintiff's claims for violations of Title VII are also violations of the PHRA.[3]

133.     Defendant Simon Hodson was at all times *herein* a supervisory employee who had decision-making authority over the terms and conditions of Plaintiff's employment.

134.     Defendant Simon Hodson was directly involved in the decision to terminate Plaintiff's employment and directly and personally orchestrated much of the harassment outlined *herein*.[4]

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

---

[3] Claims "brought pursuant to Title VII and the PHRA are generally analyzed under the same standards." *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 500 n.30 (E.D. Pa. 2014) (citing *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318-19 (3d Cir. 2008)), *aff'd*, 612 F. App'x 124 (3d Cir. 2015); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (noting that Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts."); *Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 424 (E.D. Pa. 2016) ("We apply the same standard when analyzing discrimination claims brought pursuant to Title VII, the PHRA and Section 1981.").

[4] "'[I]ndividual liability may be imposed under the PHRA on 'any person, employer, employment agency, labor organization or employe" who aids or abets any "unlawful discriminatory practice.'" *Bines v. Williams*, No. 17-4527, 2018 U.S. Dist. LEXIS 145060, at *19 (E.D. Pa. Aug. 24, 2018)(citing 43 Penn. Cons. Stat. § 955(e)).

A.     Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.     Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.     Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s Christine E. Burke*

By:     _____
Ari R. Karpf, Esq.

Christine E. Burke, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated:  November 4, 2024