**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHELLE CHRISTIAN )<br>109 Signal Hill Road, )<br>Holland, Pennsylvania 18966, )<br>)<br>      Plaintiff, )<br>)<br>   v. )<br>)<br>OMNIS GLOBAL TECHNOLOGIES, LLC )<br>3710 Collins Ferry Road, )<br>Morgantown, WV 26505 )<br>   and )<br>OMNIS BUILDING TECHNOLOGIES, LLC )<br>3710 Collins Ferry Road, )<br>Morgantown, WV 26505 )<br>   and )<br>OBT BLUEFIELD, LLC )<br>3710 Collins Ferry Road, )<br>Morgantown, WV 26505 )<br>   and )<br>OMNIS FUEL TECHNOLOGIES LLC )<br>d/b/a OMNIGEN )<br>3710 Collins Ferry Road, )<br>Morgantown, WV 26505 )<br>   and )<br>OMNIS SUBLIMATION RECOVERY )<br>TECHNOLOGIES, LLC )<br>3710 Collins Ferry Road, )<br>Morgantown, WV 26505 )<br>   and )<br>SIMON HODSON )<br>3710 Collins Ferry Road )<br>Morgantown, WV 26505 )<br>)<br>     Defendants. ) | Civil Action No. 2:24-cv-01319-MRP<br><br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CIVIL ACTION COMPLAINT

Plaintiff, Michelle Christian, by and through her undersigned counsel, brings this action against the above-named Defendants, and avers as follows:

## I.    <u>INTRODUCTON</u>

1.    Plaintiff has initiated this action to redress violations against her former employers under Title VII, 42 U.S.C. §2000e, *et seq*, the Pennsylvania Human Relations Act ("PHRA"), the False Claims Act, 31 U.S.C. § 3730(h)(1), unjust enrichment, breach of contract, the Pennsylvania Wage Payment and Collection Law ("WPCL") 43 Pa. Stat. Ann. § 260.9, and for promissory estoppel.  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth *herein*.

## II.    <u>JURISDICTION AND VENUE</u>

2.    This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.    This Court may properly maintain personal jurisdiction over Defendants because the contacts with this state and this judicial district is sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) because Plaintiff worked for Defendants in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

5.    On or about November 26, 2023, Plaintiff filed a timely charge alleging discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"),

docketed at Charge No. 530-2024-01093. This charge was simultaneously filed with the Pennsylvania Human Relations Commission.

6.      The EEOC issued a Notice of Right to Sue on January 7, 2024.

7.      This Complaint is filed within 90 days of receipt by the Plaintiff of the Notice of Right to sue.

### III.     PARTIES

8.      Plaintiff is an adult individual with an address as set forth in the caption.

9.      Defendants are all Delaware companies with shared primary business operations located at 3710 Collins Ferry Road, Morgantown, West Virginia 26505.

10.     Defendant Simon Hodson is founder and chairman of the Omnis enterprises.

11.     As discussed *infra,* though various of the Defendant entities utilize a "P.O. Box" out in California for business  purposes, there are no actual business operations existent in California and all of these different entities operate through the same owners and executive management toward a singular purpose: specializing, developing, licensing and commercializing innovative technologies to aid in the areas of clean and sustainable energy, affordable housing, organic farming, and biodegradable plastics.

12.     Plaintiff performed work for and on behalf of all Omnis Defendants.

13.     At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV.    FACTUAL ALLEGATIONS

14.    Plaintiff began working for Defendant Omnis Global Technologies LLC on November 16, 2020 as its "Vice President of Government Relations."[1]

15.    Plaintiff's job duties included connecting all Defendant Omnis companies with private and public contacts to develop all Defendant Omnis' businesses.

16.    Though Defendant Omnis Global Technologies LLC is based out of Santa Barbara California, Plaintiff was hired to work from her home in Bucks, County PA (and asked to travel where and when needed).

17.    Moreover, Defendants' Santa Barbara location ceased operations during Plaintiff's period of employment[2], and Defendants' primary lab and offices were all out of the West Virginia location as set forth in the caption.

18.    Plaintiff was hired by Defendants' owner: Simon K. Hodson (*hereinafter* "Hodson"), and Plaintiff's offer letter indicated she would report directly to Hodson.

19.    Upon information and belief, Hodson owns and operates nearly 50 different companies; however, Hodson specifically brought Plaintiff on to focus her efforts on the Defendant Omnis entities.

20.    Hodson sought to monopolize Plaintiff's then existing federal government contacts and her existing contacts with elected state officials (as Hodson was attempting to secure funding and garner support for his ongoing and expanding business projects).

---

[1] Defendants do not make any efforts to recognize corporate formalities, and comingle assets between Defendant entities, entangle leadership, and overall business operations.  To wit, Plaintiff was initially paid through Defendant Omnis Global Technologies LLC, but as time went on, Defendants started paying Plaintiff through Defendant OBT Bluefield LLC and the other named Defendants; importantly, Plaintiff reported to individuals within each of these entities and was held out to the public (including government entities) as working for each of the named Defendants.

[2] The only "business operations" currently existent in California is a P.O. Box.

21.    At all relevant times, Hodson's son, Jonathan Hodson, held himself out as a "President" of Defendant Omnis Building Technologies.

22.    At all relevant times, Hodson's other son, Michael Hodson, assisted with operations aspects of Defendant entities in various capacities.

23.    Hodson and his two (2) sons are members of the Latter-Day Saints Church ("LDS").

24.    Defendants' Vice President of Human Resources, Mathew Hart, is also a member of the LDS (while Hart holds himself out publicly as VP HR for Defendant "Omnis Building Technologies," he performs Human Resources functions for each of the Defendant entities).

25.    Defendants' General Counsel, Blake Stephens, is also a member of the LDS (while Stephens holds himself out publicly as GC for "Omnis Building Technologies," he performs GC functions for each of the Defendant entities).

26.    Defendants' CFO, Randall Smith, is Hodson's brother-in-law, is also a member of the LDS (while Smith holds himself out publicly as CFO for "Omnis Fuel Technologies LLC," he performs CFO functions for each of the Defendant entities).

27.    Defendants have consistently hired Hodson's relatives for high-level positions within their companies, as well as any direct support staff working intimately with Defendants' management.

28.    Most of Defendants' high-level managers and inner support staff are affiliated with the Latter-Day Saints Church.

29.    Plaintiff is not a member of the LDS; therefore, Hodson sought to "convert" Plaintiff to his religion and press his religious views on her throughout her entire period of employment with Defendants (and aggressively so).

30.     Many work conversations within Defendants' management brought about a discussion on religion (including facilitating LDS prayers at business meals) or included talking about events the LDS was hosting (simply by way of examples).

31.     Hodson was quite vocal with Plaintiff about his intentions to "bring her over," (meaning have her join the LDS) and Plaintiff often uncomfortably and politely declined.

32.     Plaintiff was vocal to both Hodson himself, and Jonathan Hodson about her protestations of Hodson's behavior about religion and her preference not to discuss religion at work.

33.     Defendants did not maintain any type of employee handbook during Plaintiff's tenure and had no real avenue for redress of internal complaints (and Hart: VP of Human Resources -- openly condoned some of Defendants' obvious discriminatory behaviors).

34.     Simply by way of example, at a company meeting, Stephens was speaking of his young child, and Hodson made a negative remark **about women being better suited for staying at home**.   Thereafter, Hodson directed Stephens to share an LDS prayer with Plaintiff and actually directed him to print it out.

35.     LDS teachings proscribe "responsibilities and blessings" of an LDS wife, and emphasize a woman's support of a male as the "patriarch of the home."

36.     Plaintiff reported to Hart that she opposed Simon's derogatory comment  about women being at home, and Stephens providing her with a written copy of an LDS prayer; shockingly, Hart said *he found nothing wrong with it and believed in those teachings himself*.

37.     Plaintiff was one of the few, if not only, females in an executive position with Defendant entities.

38.    During Plaintiff's time working for Defendants, she felt intentionally isolated and marginalized as both a female employe, and an employee who refused to commit to Defendants' LDS church.

39.    Defendants' management made numerous denigrating comments to Plaintiff, making generalized negative statements about her capabilities, or talking down to Plaintiff as if she was not a contributing member to meetings or the team, or as if her opinion was not nearly as important as that of her male LDS peers.

40.    Plaintiff did not witness Defendants' management make any similar comments or exhibit similar behaviors to any male employees, or any employees who were also members of the LDS Church.

41.    Throughout her employment, Plaintiff weas also subjected to constant inappropriate comments about her physical appearance.

42.    Other activities took place that demonstrated Hodson did not value women as equal contributors and clearly saw young impressionable women as merely potential new members of his faith (to be married off to LDS members).

43.    Between in or about September of 2020 and through 2022, Hodson met two (2) girls, ages 16 and 17, in Johnstown, Pennsylvania.

44.    These two (2) girls began traveling with Hodson and the company throughout Pennsylvania, West Virgina, and California.

45.    Hodson gave the impression he was going to have the girls work for Defendants (even creating a company email address for one of them), but Plaintiff never actually saw these girls perform any job duties for Defendants.

46.     Plaintiff adamantly expressed her discomfort in having girls who were in high school and under 18 years of age stay in hotels with Defendants' management (and frankly as a concept in general).

47.     Hodson provided monetary consideration to these girls to entice them continue on with Defendants entities travel affairs (including for example, paying cash for their own medical treatment).

48.     Although it was clearly not part of her job responsibilities (but since Plaintiff was one of the few, if not the only, female executive within Defendant entities), Hodson asked Plaintiff to watch over the girls and take care of them.

49.     No other male employees were asked to watch over and take care of these girls.

50.     Plaintiff then asked not to be involved with these young girls or the situation anymore.

51.     Plaintiff later discovered that Hodson and other Omnis LDS employees were taking these young girls to his Latter-Day Saints Church and other LDS events.

52.     Hodson later asked Plaintiff to help the girls with getting into college; Hodson's ongoing efforts to convert these women to his Church was interfering with Plaintiff's ability to do her job and she was vocal about her disinterest in being involved.

53.     Hodson wanted one of them to attend West Virginia University since his son, Jonathan Hodson, and his lab and offices would be in Morgantown, WV near that school.

54.     As Plaintiff was objectively being treated like Hodson's personal assistant or a female caretaker (and she felt obligated to do it because Hodson directed it), Plaintiff became briefly involved with these girls again when they first enrolled at WVU but had no further

contact with the girls until Hodson asked her to help them get a "waiver" to live off campus so Hodson could obtain and pay for these girls' apartment off campus.

55.    Upon information and belief, one of these young women is now married to a member of the LDS Church, and the other young woman is attending Brigham Young University, an institution holding itself out to the public as "founded, supported and guided by The Church of Jesus Christ of Latter-Day Saints."

56.    In short, Defendants repeatedly tried to convert Plaintiff to their religion, and entangled her in their efforts to do so with other females, often pressuring her to assist in their efforts as if it was part of her job duties.

57.    Plaintiff experienced antagonism by Hodson any time she expressed resistance in his or the company's effort to focus on religion or opposed converting persons to their religion.

58.    Plaintiff was specifically told Hodson did not believe women should be in the workplace and their role was in the home; in line with those beliefs, Hodson often singled Plaintiff out and mistreated her due to her status as a female.

**i.)    Plaintiff's Complaints to Hodson in August and September of 2023 regarding Fraud on the Government and Sex Based Harassment.**

59.    Between June through August 2023, Plaintiff began asking Hodson questions about his various companies and how certain things did not make sense financially.

60.    Plaintiff was concerned about Hodson and the Defendant Omnis companies making false representations to state and federal officials in order to receive funds and assistance in the form of government loans and grants.

61.    Plaintiff's concerns peaked when she realized that Hodson and the Omnis companies had made so many misrepresentations to government officials that it would be

extremely difficult for Plaintiff to support the claims without further understanding so she continued to ask Hodson questions.

62.    Hodson curtly responded by telling Plaintiff that she is "always whining" and that she "whines a lot."

63.    On or about June 28, 2023, Plaintiff contacted Charles Gassenheimer, an employee of Omnis Bailey, LLC and Omnis Regenerative, LLC, regarding her concerns about the financing and validity of statements Hodson was making to state and federal government officials.

64.    Charles Gassenheimer informed Plaintiff that since she was "not one of them," referring to being a member of the Latter-Day Saints Church, that she will get nowhere, no one will listen to her, and no one will take her concerns seriously.

65.    On August 30, 2023, Plaintiff finally confronted Hodson about the truthfulness of statements he was making to state and federal government officials, openly objecting to his ongoing efforts to defraud government officials for investment funds.

66.    This was not an off handed conversation, but lasted several hours; Plaintiff accused Hodson of lying to the Federal Department of Energy and the West Virginia Government, and insisted she would not lie on his behalf.

67.    Hodson knew Plaintiff had active meetings occurring and planned with government officials in the coming weeks regarding his efforts to secure a nearly $50 million-dollar forgivable loan (i.e. that her intent to report him to the Government was imminent).

68.    Hodson overtly tried to minimize Plaintiff's complaints by trying to appeal to Plaintiff as a female, and making an actual advance toward her saying: "hold my hands and look into my eyes and tell me you believe me."

69.     Plaintiff immediately responded: "**don't touch me**," and Hodson said: "Then you should go."

70.     Plaintiff walked away from the incident clearly distraught and on the verge of tears, but she was fearful of showing her emotions to Hodson, given some of the stereotypes he had already voiced about women being in the workplace.

71.     On or about September 5, 2023, Hodson sent Plaintiff a text message which stated in part:

> "Hi Michelle, I hope you had a good weekend.  There was a lot accomplished last week.  Thank you for your significant support and impact.  However, as we discussed, there is an urgent need to clarify roles and responsibilities as we grow and develop the several OGT companies. Going forward, we believe that your most critical role is to work directly for OBT Bluefield at a monthly gross compensation of $20,000. You will work with and report directly to Jonathon Hodson.  Your primary duties will be to coordinate all the WV State contacts and activities to ensure the best completion and start-up of the first manufacturing plant in Bluefield. This will include coordination of support and opportunities with Federal Agencies, State Agencies and strategic customers.  Subsequently, we would ask you to leverage the first plant's success to other sites in WV and surrounding States.  This is a national company with huge market opportunity.  Thank you for your great support to make this a success."

72.     The text message continues in great detail requesting Plaintiff help the Omnis entities in other areas, and stating, "You have helped tremendously."

73.     The text message ended by Hodson stating:

> "We are always open to discussing with you other changes that would best enable you to be most effective in your employment with the Omnis companies.  Please give me your feedback on the above structure asap so that we can memorialize all this in an employment letter.  I am also reviewing with our accounting team the resolution of your payroll to make sure that you received all the payments, including any bonuses, that were promised.  I will complete this by Wednesday.  Sincerely, Simon K. Hodson."

74.     On September 6, 2023, at 9:44 a.m., Plaintiff sent Simon Hodson an email stating in part:

> "Simon, it is important for you to understand how important the communities in West Virginia are to me.  **The treatment I have endured by you and others who work with you has been unbearable. . . My proposal also ensures that the incident that took place at the Greenbrier Resort on Wednesday, August 30, will never happen again, since I will be a Contractor and not an Employee.  I assume that you would never ask a male employee to hold your hand and look into your eyes to know the truth.  It is troubling that when I refused to hold your hand and look into your eyes, you state that you would let me go**."

75.     On September 9, 2023— days after Plaintiff had expressly raised concerns about the misrepresentations Hodson was making to government officials, and almost immediately after she complained to Hodson about overt sex based harassment — Stephens (General Counsel) instructed her to "immediately cease and desist all work for any of the Omnis companies."

76.     On September 10, 2023, Stephens threatened Plaintiff by stating, "Please be very careful about how you move forward here Michelle."

77.     Plaintiff was offered no explanation for her termination – and in fact, to date, Defendants have falsely represented that Plaintiff **voluntarily resigned from her employment**.

78.     Defendants were so concerned about Plaintiff's intended whistle blowing activities, Defendants then filed a separate civil action against Plaintiff in Bucks County Court of Common Pleas, making claims of conversion so they could obtain her computer (a personal computer which was not even Defendants' property) and then making threats of *anticipated* claims for violation of trade secret laws, of which they have no proof.

## COUNT I
## SEX DISCRIMINATION, RETALIATION, AND HARASSMENT
## IN VIOLATION OF TITLE VII,

*42 U.S.C. §2000e, et. seq*

79.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

80.    Defendants took an adverse employment action against Plaintiff based on her sex by, among the other conduct alleged herein, constantly (1) making comments about her physical appearance; (2) making demeaning comments to Plaintiff solely because she was a woman; and (3) making her perform tasks that were not in her job description solely because she was a woman.

81.    Plaintiff expressly opposed Hodson's mistreatment toward her due to her sex in extremely close proximity to her abrupt separation.

82.    The sex-based discrimination Plaintiff experienced was both severe and pervasive, as Plaintiff was subjected to it on multiple occasions throughout her employment and leading to her ultimate separation.

## COUNT II
## RELIGIOUS DISCRIMINATION, RETALIATION, AND HARASSMENT IN VIOLATION OF TITLE VII
### *42 U.S.C. § 2000e*

83.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

84.    Hodson and many other Omnis executives were part of the LDS Church.

85.    Hodson and other high-level managers within Defendants constantly spoke of their religion and encouraged Plaintiff to engage in discussions about the LDS Church and to become a member.

86.    Hodson often mistreated Plaintiff because her religious beliefs did not align with his and other Omnis employee's religious beliefs.

87.     Plaintiff repeatedly engaged in protected activity by protesting Hodson's efforts to force his religious views upon her, complaints she also shared with other high-level executives within Defendants.

88.     Plaintiff therefore avers she was subject to religious discrimination, subject to a hostile work environment on account of her religious views and terminated for engaging in protected conduct under Title VII by opposing religious discriminatory practices in the workplace.

## COUNT III
## RETALATION IN VIOLATION OF THE FALSE CLAIMS ACT
### *31 U.S.C. § 3730(h)(1)*

89.     Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

90.     When Plaintiff first came to work for the Omnis entities, she was directly reporting to Defendant Simon Hodson and hired to work for "Omnis Global Technologies," operating out of Santa Barbara, California (though Plaintiff was hired to work in a remote capacity from her home in Bucks, County Pennsylvania).

91.     Plaintiff quickly learned that Defendant Hodson owned close to 100 registered companies, but there were specific companies that Defendant Hodson preferred Plaintiff focus her attention on (as it pertained to her job responsibilities).

92.     This included initially focusing her duties on "Omnis Energy," and "Omnis Fuel Technologies," which businesses were operating a plant at the Bailey Mine Complex in West Finley, Pennsylvania (outside of Pittsburgh).  The business purpose of Omnis Energy/Omnis Fuel Technologies was to provide clean energy solutions.

93.     In addition to Omnis Energy/Omnis Fuel Technologies, Plaintiff was asked to

focus on "Omnis Building Technologies," a Delaware corporation intended to operate out of West Virginia and "OBT Bluefield," a Delaware corporation that was wholly owned by Omnis Building Technologies.

94.    Omnis Building Technologies' business purpose was to utilize concrete technology to facilitate building residential homes in a matter of days (and homes which could generate their own water and electricity); the technology that Omnis Building Technologies was producing was considered revolutionary to the housing industry.

95.    Internally, this project was being referred to as the "Bluefield Project."

96.    From a mission standpoint, the Bluefield Project was of great interest to federal, local and state politicians -- as it was touted as a means of curing the housing shortage impacting residents in West Virginia (and across the United States) and it was expected to bring many jobs to the local area.

97.    Defendant Hodson and his son Jonathan Hodson (who would ultimately be held out as the "President" of "Omnis Building Technologies") were working from the time of Plaintiff's hire to gain investors for the "Bluefield Project."

98.    Those investors transitioned from private to seeking to obtain federal funds, as discussed *herein*.

99.    Within a few months of Plaintiff's hire, she became aware of substantial investment opportunities Defendant Hodson had secured for the Bluefield Project.

100.    By January of 2021, Omnis Building Technologies had obtained substantial investors, including Bill Cole (former West Virginia Senator) and several others, and had secured several million dollars toward the Bluefield Project.

101.    Defendant    Hodson    continued    to    explore    additional    investors/business

15

development opportunities, as the several million he initially received wasn't nearly enough to sustain projected business expenditures.

102.    Thus, in or about March of 2021, Defendant Hodson was exploring a business opportunity with property owner Danny Wilfong (then owner of an abandoned industrial property located in Clarksburg, WV). In lieu of providing cash for the property, Defendant Hodson tried to structure a deal whereby Wilfong would be paid a percentage of future revenues from this venture. However, the deal with Wilfong did not ultimately come to fruition.

103.    In or about April of 2021, Defendant Hodson was exploring business opportunities with Genesis Partners of Bridgeport, WV (including with its President/Chairman James "Jamie" Corton), as Genesis Partners was a property development company. Defendant Hodson wanted to partner with Genesis Partners to purchase a manufacturing facility in Bridgeport, WV (in the same general location where he had been looking to buy Wilfong's property).

104.    In pursuing negotiations with Genesis, Defendant Hodson was again offering future revenues in his business venture in lieu of providing any cash (newly labeled "Omnis Technology Campus"), and he was simultaneously misrepresenting the present current value of the venture.

105.    Specifically, Defendant Hodson misrepresented to Genesis that his business project already had purchase orders executed for the housing they were intent on building (i.e. that he had buyers lined up and these houses just needed to be built; thus he needed a manufacturing facility and the actual housing supplies). Defendant Hodson's representations were materially false (as he had no purchase orders), and ultimately, negotiations with Genesis did not come to fruition.

106.    Because Defendant Hodson was unsuccessful with securing additional property (assets) through Wilfong or Genesis, he turned to a bank.

107.    In or about April of 2021, Defendant Hodson approached Live Oak Bank (headquartered in Wilmington, North Carolina) for a loan.

108.    At or around this time, Defendant Hodson was actively trying to secure a $25 million loan, guaranteed through the United States Department of Agriculture ("USDA").

109.    As one would expect, Live Oak Bank had to do its due diligence to providing any loan (let alone the type of financing Defendant Hodson was seeking).

110.    In order to secure funding from Live Oak Bank and pass a due diligence process, Defendant Hodson materially misrepresented to the bank the financial health of his Omnis companies, and affirmatively misrepresented that he had actual purchase orders for homes to be built.

111.    The due diligence period was not proving promising for this federally guaranteed loan; therefore, Defendant Hodson attempted to pursue a conventional loan through Live Oak Bank. The problems with the conventional loan, however, was Defendant Hodson's concession that he had no domestic assets (claiming all of his assets were allegedly overseas in China).

112.    Live Oak's CEO (James S. 'Chip' Mahan III) actually visited Omnis' businesses in California and visited a *projected* a manufacturing site in Bridgeport, WV to assess the risks for providing a loan of this magnitude.

113.    Ultimately, Defendant Hodson did not pass Live Oak's due diligence process, and he was not able to secure the $25 million federally guaranteed loan (nor a conventional loan).

114.    Defendant Hodson was failing at every turn to obtain funding for his Bluefield Project, and whilst trying to obtain his loan through Live Oak, he was also leveraging an

17

investment firm in New York City called Obsidian Investment Partners.

115.    Defendant Hodson's attempt to obtain investments through Obsidian also never made it through the due diligence phase.

116.    During this same year, from in or about July of 2021 through in or about December of 2021, Defendant Hodson and several of his executive leaders, including Charles Gassenheimer (President Omnis Energy) and Alex Simpson (General Counsel, Omnis Regenerative Energy LLC/Omnis Fuel Technologies LLC) were trying to raise funding for Omnis Energy and its related entities (operating at the Bailey Mine Complex in Pennsylvania).

117.    Omnis Global Technologies and Omnis Energy's own funding was dwindling, employees were being laid off and salaries were trimmed down to bare operations.

118.    Fundraising attempts were consistently being made to maintain Omnis Global, Energy and related business ventures.

119.    To that end, Defendant Hodson tried to secure Long Ridge Energy & Power (a gas and power business also concentrating in clean energy), operating from Hannible, Ohio as an investor.  Defendant Hodson was interested in operating a manufacturing facility at Long Ridge's site in Hannibal, with Long Ridge as an investor.

120.    The opportunity with Long Ridge never made it through the due diligence phase.

121.    At this point, Defendant Hodson became very interested in seeking federal loans and/or federal grants through the Department of Energy and other state and local agencies since he assumed it was an opportunity to obtain the funds needed for the survival of his companies.

122.    By March of 2022, Defendant Hodson had substantial backing from local political figures in West Virginia, including then Governor Jim Justice, who attended the groundbreaking ceremony for Omnis Building Technologies at or around this time.

123.    To facilitate its business operations, Omnis Building Technologies ultimately built a $40 million-dollar 135,000 square foot facility for manufacturing operations, *claiming* they would employ upwards of 300 employees at a facility in Bluefield, West Virginia.

124.    The Bluefield project was supposed to provide hundreds of jobs within the local community and Defendant Hodson had secured a little over $1 million in funding from the government, in a contract executed by Jonathan Hodson, to start land projects for the building (which upon information and belief hasn't come to fruition to date, even in 2025).

125.    Defendants had obtained a grant through the United States Economic Development Administration for $1 million to help the Bluefield EDA develop the Bluefield site.

126.    Government officials at all levels, including US Senator Shelley Moore Capito, Governor Jim Justice, the West Virginia Department of Economic Development, United States Economic Development Administration, Mercer County Commission, Mercer County EDA, City of Bluefield, the Bluefield EDA were all involved in working with Omnis to help promote the Bluefield project (many attending its groundbreaking ceremony in March 2022).

127.    In or about March 2022, Plaintiff's paycheck changed from being issued by Omnis Global Technologies LLC to OBT Bluefield LLC.  Plaintiff was given no notice of this change, and when she asked for the change in paymaster, she was not given any reason.

128.    By August of 2022, although federal government monies were spent for land development for the Bluefield Project, the facility never commenced operations.

129.    Even to date in 2025, they are still *predicting* hiring upwards of 220 employees and appreciating the facility will not be fully operational until the summer of 2026.

130.    Defendants openly tout "supply chain" and financing issues to the general public, however, Plaintiff was aware that Defendants were not ordering any of the supplies

necessary to facilitate the build of these homes to fulfil claimed orders.

131.    Though most of his financing efforts had been focused on the Bluefield Project, Defendant Hodson had been actively worked to and did acquire space in Morgantown, WV (located at 3710 Collins Ferry Road), commonly referred to as the "lab".

132.    The West Virginia Economic Development Authority (EDA) and the Morgantown, West Virginia local EDA had assisted with the acquisition for this lab.

133.    It is believed that the majority of the lab is still being used to store furniture and other personal items of the Hodson family.

134.    Most of Defendant Hodson's fundraising efforts for his alleged technology were through WVEDA (West Virginia Economic Development Agency).

135.    WVEDA promotes business prosperity and economic welfare by offering loans and financial assistance to manufacturing businesses and industrial process entities.

136.    WVEDA has a direct lending program, but a majority of the funding supplied by WVEDA was a pass through from the federal government, including through federal tax-exempt industrial revenue bonds and federally funded grants.

137.    The payments for the Morgantown, WV lease itself were consistently late, and Plaintiff was receiving calls from the local EDA constantly seeking payment on the contract for the property.

138.    Plaintiff was consistently told by Defendant Hodson and Randy Smith (CFO of all Omnis entities) that the money was "tied up in China," and elsewhere.

139.    By November 2022, Defendant Hodson was representing to the West Virginia Governor's office that another one of his Omnis entities: "Omnis Sublimation Recovery Technologies LLC," was proceeding to open a new facility on property in Wyoming County,

WV.

140.    Defendant Hodson convinced the government that he was able to extract rare earth elements from old piles of coal waste.

141.    Defendant Hodson participated in a formal press conference, purporting to confirm rare earth elements were found in land he was to do business on in Wyoming County, West Virginia.

142.    It was later found that Defendant Hodson had not actually secured any lease for any property in Wyoming County (as touted to the Governor's Office and the Press), but Defendant Hodson was merely using it as a front to pass off his involvement in active/lucrative business endeavors to promote funding he was trying to secure for his other Omnis' ongoing/new projects.

143.    It is further believed that Defendant Hodson actually purchased some of the alleged test tubes of rare earth elements he showed the Governor, off the internet and did not actually find them on property in West Virginia.

144.    In or about the Fall of 2022, Defendant Hodson executed a contract with the State of West Virginia that would allow Omnis Sublimation Recovery Technologies to receive dollar for dollar matching funds, which are believed to be originally federal funds allocated to the states, for funds Omnis actually expended on its Bluefield project.

145.    In or about December of 2022/January 2023, Defendant Hodson was attempting to obtain payment from the State of West Virginia by alleging that he had already spent millions of dollars on the project.

146.    Plaintiff was present in Charleston, West Virginia at the EDA office with West

Virginia state employee Vic Sprouse,[3] when she called a company called Industrial Accessories Company, "IAC"[4] the company to which Defendant Hodson claimed to have hired to perform the work in West Virginia.

147.    IAC and specifically, the President of IAC Bob Carter, stated that Defendant Hodson did not pay any monies to IAC as the documents provided by Defendant Hodson to the state implied.

148.    Bob Carter additionally stated that IAC will not perform any work until Simon Hodson made payment in advance for the services.

149.    Plaintiff informed Sprouse that there was nothing further to discuss since the invoices at issue which were provided by Defendant Hodson were misleading.

150.    Defendant Hodson attempted to receive the matching funds from the government when in fact he made no payments to anyone and was not entitled to any government funds as a "dollar for dollar reimbursement."

151.    Plaintiff told Defendant Hodson at that point that she was very uncomfortable with what happened and that she would not lie or mislead the government, and continued to tell Defendant Hodson that she would not pursue the matter further on his behalf until there was actual proof that Defendant Hodson spent the  money he claimed -- and paid IAC (or another company) pursuant to the terms of the agreement with the government.

152.    Several months later when the original agreement with the State of West Virginia was expiring, Defendant Hodson asked Plaintiff to help but once again and see if she could reinstate the agreement.

---

[3] At this time, Sprouse, was West Virginia's Infrastructure Coordinator and Federal Funds and Grants Director, for the West Virginia Dept. of Economic Development.
[4] An entity formally called "Industrial Accessories Company," operating out of Kansas.

153.    Plaintiff told Defendant Hodson that she would see if she could help but that he must have receipts to prove to the government that he spent money and she would not lie for him.

154.    Plaintiff also told Defendant Hodson that she would tell the government if he tried to mislead them again.

155.    Plaintiff went to the EDA office in Charleston, West Virginia and worked with a government official, specifically staff Secretary Mitch Carmichael, to change the agreement with Defendant Hodson to specifically state that Defendant Hodson must show actual receipts and not just invoices to show that he spent monies on the project.

156.    Defendant Hodson was upset with Plaintiff, but she still told the state that Defendant Hodson misled them and that the agreement should be changed so taxpayer money was not given to Defendant Hodson unless he complied with all terms.

157.    Once Defendant Hodson realized that the Omnis Sublimation Recovery Technologies project would not get him government money he began to target a new business venture in Pleasants County, West Virginia, specifically acquiring the Pleasants Coal Fired Power Plant.

158.    In or about January of 2023, Defendant Hodson was in negotiations with Tony Robbins as a prospective investor for the Pleasants Power Plant, along with other foreign investors including those from Saudi Arabia.

159.    Plaintiff informed Defendant Hodson that foreign investors may impact his ability to obtain federal funds.

160.    Plaintiff once again informed Defendant Hodson that she would not lie or mislead any government officials for him.

161.    Defendant Hodson began to have secret meetings with Tony Robbins and foreign investors about the Pleasants Power Plant project.

162.    Robbins ultimately invested approximately $200 million in the Omnis Defendants' new technology.

163.    Beginning in 2023, it was clear that Defendant Hodson, and his executives, including one Richard Hulme (also holding himself out as President of Omnis Energy) were targeting Pleasants County, WV for constructing their latest endeavor to obtain private investments and government funding.

164.    Defendant Hodson began travelling to Pleasants County with former West Virginia Senator Bill Cole to convince local leaders to support his purchase of the power plant.

165.    Defendant Hodson was still very interested in pursuing federal funding, specifically from the United States Department of Energy (DOE).

166.    Plaintiff believes that Defendant Hodson digressed from Tony Robbins at the time as well as many of his potential investors to avoid disclosing foreign investors to federal agencies.

167.    Plaintiff informed Defendant Hodson that she would not be able to help him with the federal funding through the DOE -- and Defendant Hodson hired, at Plaintiff's request, lobbyist Randa Fahmy to assist with Washington, DC and federal matters.

168.    Defendant Hodson tried unsuccessfully in or about March of 2023 to obtain a loan of nearly $800 million from the DOE.

169.    Between in or about January of 2023 and July of 2023, then Commissioner Jerome ("Jay") Powell of Pleasants County contacted Plaintiff numerous times concerned about the legitimacy of Omnis and Defendant Hodson and he wanted to know if Defendants actually

had the funds for taking over and operating the power plant in Pleasants County.

170.    Defendant Hodson asked Plaintiff to provide confirmation to Commissioner Powell that he, Defendant Hodson was securing the federal funding he needed for this project. In turn, the Commissioner's office was sending lists of items they wanted in connection with any federal funding to help their local community.

171.    Defendant Hodson was trying to create a "give to get scenario," assuring Commissioner Powell that the County would get what they asked for from the federal government, if Commissioner Powell could help Defendant Hodson obtain the power plant with political and public backing.

172.    Plaintiff told Defendant Hodson that she would not lie to Commissioner Powell or anyone regarding the project and would be left no choice but to tell them the truth about the status of Defendants' business operations, lack of financing (at least in the United States), and lack of any proven technology.

173.    Plaintiff told Commissioner Powell, who called her often with his concerns that Defendant Hodson was not "real", that no federal funding was guaranteed or able to be allocated for his community (as Defendant Hodson was suggesting), and that Defendant Hodson had no authority to make promises on behalf of the federal government (as all of that would be dealt with through applications for funding and whether or not the applying entity met the requirements).

174.    Plaintiff told Defendant Hodson numerous times that she cannot promise, nor can she tell people that Defendant Hodson has the ability to allocate federal funds to third parties when he is the applicant.

175.    Plaintiff told Defendant Hodson that she would not lie to government officials at

any level or mislead them into thinking that they would be entitled to money when it was not true.

176.     Defendant Hodson had also asked Plaintiff to engage in negotiations with a company located next to the Pleasants Power Plant named Solvay (a science company with significant presence in WV).

177.     In order to garner Solvay's support, Defendant Hodson was representing to Solvay's Executives that he could provide them federally guaranteed loan monies and funding for Solvay's own projects.

178.     In speaking with Solvay's CEO and their Director of Government Relations herself, Plaintiff assured the exact opposite: Defendant Hodson's statements were simply incorrect and he couldn't make any guarantee about funding (nor where those funds could be spent).

179.     Approximately between May 2023 to August 2023 Defendant Hodson was scheduling meetings in Charleston, West Virginia *without* Plaintiff, as he was seeking $100 million dollars through the State (and any federal funding available through the State).

180.     Plaintiff learned through conversations with government officials that Defendant Hodson was claiming to already have secured a substantial loan and funding from the DOE – when in fact, he had been denied even the ability to apply for the funding.

181.     At this time, Defendant Hodson knew that Plaintiff would not help him lie to government officials since she repeatedly told him she would not and that she would continue to tell officials if he lied.

182.     At one point, when Defendant Hodson found out that Plaintiff told the government the truth, that Defendant Hodson was misleading and/or lying to them, he lashed out

at her and said that now they are only going to give him half of what he was asking for and that it was all her fault that he is only getting $50 million instead of $100 million.

183.    According to the WVEDA office, $100 million in funding has a different due diligence process than a $50 million award through the WVEDA (and did not need to be voted upon by the legislature).

184.    Upon information and belief, a forgivable loan up to $50 million involved substantial discretion by WVEDA.

185.    Plaintiff and Defendant Hodson continued to argue and disagree that he needed to stop telling the officials in the State of West Virginia that he was vetted by the Federal Department of Energy and was approved for hundreds of millions of dollars. The truth being that Defendant Hodson did not even qualify at that time to apply for any money from the Loan Processing Office at the Federal Department of Energy, let alone get approved for any money.

186.    On or about August 30, 2023, Plaintiff confronted Simon Hodson about the false statements that he was making to state and federal government officials to receive government funding and made known her intentions to continue to report his false claims to government officials.

187.    On August 30, 2023, at a Chamber of Commerce lunch event, Plaintiff expressed once again to Defendant that she will not lie for him and go along with his misleading statements. Later that day, at the home of Bill Cole, Plaintiff and Defendant Hodson further discussed her disdain for his lies to the government and how she would not lie for him. Plaintiff felt compelled to help bring true all of the promises of economic development and jobs for distressed communities that Defendant Hodson promised but she told him she would not be a part of his fraud towards the government.

188.     Defendant Hodson was touting revolutionary technology that Plaintiff knew was not being utilized in any space in the United States, though Defendant Hodson generally claimed the technology worked in "China," but would not specify where.

189.     Plaintiff was unwilling to be complicit in actively representing the type of business operations underway, either in or around the Pittsburgh, PA facility, the Bluefield, WV facility, the proposed Wyoming County, WV project and now the Pleasants power plant.

190.     On or about September 5, 2023, Plaintiff spoke with Mike Graney (Executive Director, Division of Economic Development), who asked for the names and contact information of the people that Defendant Hodson claimed he was working with at the Federal Department of Energy to get information about the financial health of his company. Plaintiff told Graney she could not provide any contact information since Defendant Hodson, as of September 2023, had not been a part of the federal loan process and was still was not given permission to apply for the federal loan or other federal funds.

191.     Plaintiff once again told the WV state government that Defendant Hodson was still lying and being misleading to pursue the $50 million forgivable loan.

192.     Plaintiff, up and until she was terminated by Defendant Hodson, always told Defendant Hodson she would not lie to any government agencies to assist him in securing funding (based upon false information).

193.     Because Defendant Hodson could not rely on Plaintiff to ratify his misrepresentations, Defendant Hodson secured a consulting firm out of Utah to obtain funding from the State of WV.

194.     The consultant, Michael Deaver, and Defendant's son-in-law, Doug Quezada, began working with former West Virginia Senator Bill Cole and Defendant Hodson to convince

the government that they should give him the loan which could be converted into a grant that he would not have to pay back.

195.     Defendant Hodson hired the Utah consulting firm and had his son-in-law involved on the project, however Plaintiff continued having conversations with WV state officials, including then Department of Economic Development Secretary Mitch Carmichael, Nicholas S. Preservati (WV Office of Energy) and other State Agency representatives. Plaintiff confirmed to them that the information relayed by Defendant Hodson was inaccurate information and that Defendant Hodson was misleading the West Viginia government to obtain government funds.

196.     Defendant Hodson ultimately secured a $50 million low interest forgivable loan for the Pleasants Power Plant and its intended "new technology," but only after Defendant Hodson removed Plaintiff as an obstacle as she was directly interfering with his efforts to conceal foreign investors, make material misrepresentations about his assets and receipt of federal funds through the EPA, continued misrepresentations about paid purchase orders for the Bluefield project, and the lack of active operations to produce the technology claimed at any of the sites at issue.

197.     In fact, the Bluefield Facility is vacant and not operating, the Wyoming County project never advanced and the Pleasant Power Plant is *still* working as a coal fired power plant today, with no indication the facility will produce any "coal to hydrogen" -- the technology Defendant Hodson led state authorities to believe already existed in order to obtain the $50 million in federal funds.

## COUNT IV
## UNJUST ENRICHMENT

198.     Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

199.     Plaintiff was hired by Defendants in November 2020 at an annual salary of $250,000.00.

200.     Due to Defendants' financial condition in July 2021, Plaintiff was furloughed.

201.     In an effort to retain several employees, Defendants began offering incentive bonuses.

202.     On July 22, 2021, Defendants sent Plaintiff an offer letter to return to her position.

203.     That written offer stated, among other things, that: 1) Plaintiff would be compensated at an annual salary of $54,080.00; and 2) Defendants would pay Plaintiff a bonus following its receipt of $10 million or more in outside funding.

204.     Defendants, both in writing and orally, represented that bonus would be 110% of the difference between the compensation Plaintiff would have received under her terms of employment prior to this furlough ($250,000.00) and the compensation she received following her return to employment ($54,080.00).

205.     This non-discretionary bonus of $215,512.00 induced Plaintiff's return to Defendants, and in fact, Plaintiff accepted this offer and began working for Defendants.

206.     Thereafter, upon information and belief, Defendants did obtain in excess of $10 million in outside funding.

207.     Despite this, Plaintiff never received any of the $215,512.00 promised to her by Defendants.

**COUNT V**
**BREACH OF CONTRACT**

208.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

209.    The assertions set forth in Count III also establish a claim for breach of contract, as the Parties entered into an express written contract for a specific bonus amount.

210.    Those conditions were satisfied and Defendants materially breached the terms of the Parties' agreement.

**COUNT VI**
**UNPAID WAGES IN VIOLATION OF PENNSYLVANIA'S WAGE PAYMENT AND COLLECTION LAW**
*43 Pa. Stat. Ann. § 260.9a*

211.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

212.    Plaintiff was employed by Defendants.

213.    As part of her terms of her compensation, Defendants contractually agreed to pay Plaintiff a non-discretionary bonus in the amount of $215,512.00 upon receipt of $10 million or more in outside funding.

214.    Thereafter, Defendants obtained in excess of $10 million or more in outside funding.

215.    Despite numerous promises to do so, Defendants never paid Plaintiff her non-discretionary bonus of $215,512.00.

216.    Defendants then terminated Plaintiff's employment without paying her the bonus.

217.    Plaintiff's unpaid bonus is a "wage" under the Pennsylvania Wage Payment and Collection Law. 43. P.S. § 260.2a.

218.    Plaintiff's unpaid bonus is also a "fringe benefit and wage supplement" under the Pennsylvania Wage Payment and Collection Law, which must be paid "within 10 days after such payments are required to be made directly to the employee, or within 60 days of the date when proper claim was filed by the employee in situations where no required time for payment is specified." 43 P.S. § 260.3(b).

219.    Defendants' failure to pay Plaintiff's non-discretionary bonus of $215,512.00 is a violation of the WPCL.

220.    The $215,512.00 has remained unpaid more than sixty days after payment became due.

221.    Plaintiff is entitled to liquidated damages in an amount equal to twenty five percent of the unpaid wages. 43 P.S. § 260.10.

**COUNT VII**
**PROMISSORY ESTOPPEL**

222.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

223.    Defendants should have reasonably expected that its promise to pay Plaintiff $215,512.00 would induce Plaintiff to return to her position following a furlough.

224.    Plaintiff detrimentally relied on this promise, as she would not have returned to Defendants at a salary that was almost four times less than what she was previously making without it.

225.    Defendants not only agreed in writing to pay Plaintiff this bonus but also reaffirmed this promise several times throughout Plaintiff's employment.

226.    Defendants should have reasonably expected that repeatedly assuring Plaintiff that it would pay her the bonus would induce Plaintiff to continue working for Defendants.

227.    Plaintiff detrimentally relied on Defendants' repeated assurances, as she would not have continued to work for Defendants if she knew that they would never pay her the promised bonus.

**COUNT VIII**
**SEX DISCRIMINATION, RELIGIOUS DISCRIMINATION, RETALIATION,**
**AND HARASSMENT**
**IN VIOLATION OF THE PHRA**
**Title 43 P.S. §§ 951-963**
**Against All named Defendant Entities and Defendant Simon Hodson**

228.    Plaintiff incorporates the allegations in the paragraphs above, as if fully set forth at length herein.

229.    Plaintiff's claims for violations of Title VII are also violations of the PHRA.[5]

230.    Defendant Simon Hodson was at all times *herein* a supervisory employee who had decision-making authority over the terms and conditions of Plaintiff's employment.

231.    Defendant Simon Hodson was directly involved in the decision to terminate Plaintiff's employment and directly and personally orchestrated much of the harassment outlined *herein*.[6]

---

[5] Claims "brought pursuant to Title VII and the PHRA are generally analyzed under the same standards." *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 500 n.30 (E.D. Pa. 2014) (citing *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318-19 (3d Cir. 2008)), *aff'd*, 612 F. App'x 124 (3d Cir. 2015); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (noting that Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts."); *Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 424 (E.D. Pa. 2016) ("We apply the same standard when analyzing discrimination claims brought pursuant to Title VII, the PHRA and Section 1981.").

[6] "[I]ndividual liability may be imposed under the PHRA on 'any person, employer, employment agency, labor organization or employe" who aids or abets any "unlawful discriminatory practice.'" *Bines v. Williams*, No. 17-4527, 2018 U.S. Dist. LEXIS 145060, at *19 (E.D. Pa. Aug. 24, 2018)(citing 43 Penn. Cons. Stat. § 955(e)).

33

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.    Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.    Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s Christine E. Burke*

By: _____

Ari R. Karpf, Esq.
Christine E. Burke, Esq.
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801

Dated:  October 30, 2025